MORRIS POLICH & PURDY, LLP
CANDACE C. CARLYON, ESQ.
Nevada Bar No. 2666
MATTHEW R. CARLYON, ESQ.
Nevada Bar No. 12712
3800 Howard Hughes Parkway, Suite 500
Las Vegas, NV 89169
Telephone No. (702) 862-8300
Facsimile No.  (702) 862-8400
Email: ccarlyon@mpplaw.com
        mcarlyon@mpplaw.com
*Counsel for Unsecured Creditors Committee*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>SUPERIOR LINEN, LLC,<br><br>Debtor.<br><br><br>OFFICIAL COMMITTEE OF UNSECURED CREDITORS<br><br>Plaintiff,<br><br>vs.<br><br>RD VII, LLC; D.W. "Doc" Weiner; Philipe Pageau-Goyette;   Richard   Keister;   Rex Runzheimer, individually and as trustee of the Rex Runzheimer Living Trust; Fred Seto; Andrew Gasser; Daryl Hermann; SPG Investments, LLC; Brightlight Holdings, LLC; Little Current, LLC; Fortuna & Sons, LLC; Fortuna Partners; M-Superior Investor, LLC; Florian Nanz; ESC Capital; Moritz Kratzer; Fortuna Partners One, LLC; Montresor Corporation; and Nameriko, LLC; New Image Dry Cleaners, LLC; Max Enterprises, LLC.<br><br>Defendants. | Case No.: 16-15388-mkn<br>Chapter 11<br><br><br>**COMPLAINT**<br><br><br>Adversary Case No: |

1

1    Plaintiff, Official Committee of Unsecured Creditors (the "UCC") of Superior Linen,

2    LLC (the "Creditor" or "Superior"), by and through their undersigned counsel, Morris Polich

3    and Purdy, LLP hereby submits this Complaint and alleges the following:

4    I.

5    PARTIES, JURISDICTION AND VENUE

6    A. The Parties.

7    1.    Superior Linen, LLC ("Superior Linen"), is a Nevada Limited Liability

8    Company and the Debtor in the Chapter 11 Bankruptcy Case captioned In re Superior Linen,

9    LLC, Case #BK-S-16-15388-mkn (the "Bankruptcy Case") currently pending in the United

10    States Bankruptcy Court, District of Nevada (the "Bankruptcy Court").

11    2.    As of the date the Bankruptcy Case was filed, the members of Superior Linen

12    were Fortuna Partners One, LLC; Montresor Corporation; Little Current, LLC; Florian Nanz;

13    Moritz Kratzer; Nameriko, LLC; ESC Capital; D.W. "Doc" Weiner; Brightlight Holdings,

14    LLC; M-Superior Investor, LLC; Andrew Gasser; and the Rex Runzheimer Living Trust;

15    3.    Defendant Fortuna Partners One, LLC ("Fortuna") is a Nevada Limited

16    Liability Company.

17    4.    Plaintiff is informed and believes, and thereon alleges, that Fortuna is owned

18    and/or controlled by Defendant Philipe Pageau-Goyette ("Goyette").

19    5.    Plaintiff is informed and believes, and thereon alleges, that Goyette is in

20    individual who maintains a business address in Clark County, Nevada.

21    6.    At the times mentioned herein, Goyette was a member of the board of

22    directors of Superior Linen.

23    7.    Defendant Montresor Corporation ("Montresor") is a Nevada Corporation.

8.      Plaintiff is informed and believes, and thereon alleges, that Montresor is owned and/or controlled by Defendant Goyette.

9.      Defendant Little Current LLC ("Little Current") is a Nevada Limited Liability Company.

10.     Plaintiff is informed and believes, and thereon alleges, that Little Current is owned and/or controlled by Defendant Fred Soto ("Soto").

11.     Plaintiff is informed and believes, and thereon alleges, that Soto is an individual who maintains a business address in Clark County, Nevada.

12.     At the times mentioned herein, Soto was member of the board of directors of Superior Linen.

13.     Plaintiff is informed and believes, and theron alleges, that Defendant, Nameriko, LLC ("Nameriko") is a Delaware Limited Liability Company.

14.     Plaintiff is informed and believes, and thereon alleges, that Nameriko is owned and/or controlled by Defendant Florian Nanz.

15.     Plaintiff is informed and believes, and theron alleges, that Defendant Nanz is an individual who, during the time set forth herein, was a shareholder in Superior Linen.

16.     Plaintiff is informed and believes, and thereon alleges, that Defendant Brightlight Holdings, LLC ("Brightlight") is a Florida Limited Liability Company.

17.     Plaintiff is informed and believes, and thereon alleges, that Brightlight is owned and/or controlled by Defendant Richard Keister ("Keister").

18.     Plaintiff is informed and believes, and thereon alleges, that Keister is an individual residing in Florida who, at the times specified herein, was an owner, board member, and exercised control over Superior Linen.

19.     Plaintiff is informed and believes, and thereon alleges, that Defendant Rex Runzheimer (Runzheimer) is an individual residing in Florida, and is the Trustee of the Rex Runzheimer Living Trust.

20.     At all times mentioned herein, Runzheimer was a member of the Board of Directors of Superior Linen.

21.     Defendant, RD VII, is a purported pre-petition lender to Superior Linen.

22.     Plaintiff is informed and believes, and thereon alleges, that RD VII's members are Rex Runzheimer; Daryl Hermann; SPG Investments, LLC; Brightlight Holdings, LLC; Little Current, LLC; Fortuna & Sons, LLC; M-Superior Investor, LLC; Florian Nanz; ESC Capital; and Moritz Kratzer.

23.     Plaintiff is informed and believes, and thereon alleges, that Defendant Daryl Hermann is an individual who, at the times mentioned herein, conducted business in Clark County, Nevada.

24.     Defendant SPG Investments, LLC ("SPG") is a Florida Limited Liability Company.

25.     Plaintiff is informed and believes, and thereon alleges, that SPG is owned and/or controlled by Goyette.

26.     Plaintiff is informed and believes, and thereon alleges, that Defendant Fortuna & Sons, LLC ("F&S") is a business owned and controlled by, or a dba of, defendant Goyette.

27.     Plaintiff is informed and believes, and thereon alleges, that Defendant Fortuna Partners, LLC, is a Nevada Limited Liability Company, and may be the true name of Defendant Fortuna & Sons, LLC.

28.     Plaintiff is informed and believes, and thereon alleges, that Fortuna Partners, LLC is owned and/or controlled by Goyette.

4

29. Defendant M-Superior Investor, LLC, is a Florida Limited Liability Company.

30. Plaintiff is informed and believes, and thereon alleges, that Defendant Florian Nanz is an individual who, at the times herein alleged, conducted business in Clark County, Nevada.

31. Plaintiff is informed and believes, and thereon alleges, that Defendant ESC Capital is a Nevada Corporation.

32. Plaintiffs are informed and believe, and thereon allege, that ESC Capital is owned and/or controlled by Nanz.

33. Plaintiff is informed and believes, and thereon alleges, that Defendant Moritz Kratzer is an individual residing in Germany who conducts business in the United States.

34. Defendant Andrew Gasser ("Gasser") served as Vice President and Chief Financial Officer ("CFO") of the Superior Linen.

35. Plaintiff is informed and believes, and thereon alleges, that Gasser currently resides in Ohio.

36. Defendant D.W. "Doc" Weiner ("Weiner") is an individual residing in Clark County, Nevada.

37. Weiner was, at the times of the actions described herein, a manager of Superior Linen.

38. Weiner was, at the times of the actions described herein, an owner of Superior Linen.

39. Plaintiff is informed and believes, and thereon alleges, that Weiner was, at the times of the actions described herein, an owner of New Image Dry Cleaners, LLC ("New Image").

40.    Plaintiff is informed and believes, and thereon alleges, that Max Enterprises, LLC is a Nevada Limited Liability Company.

41.    Plaintiff is informed and believes, and thereon alleges, that Weiner was, at the times of the actions described herein, an owner of Max Enterprises, LLC.

**B.  Jurisdiction and Venue.**

42.    This is an action arising under and related to a case under Title 11, United States Code.

43.    This is a Core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), (B), (F), (H), (K), and (O).

44.    Plaintiffs consent to the entry of final relief by the Bankruptcy Court.

45.    As to claims as to which Plaintiff is entitled to jury trial, Plaintiff consents, pursuant to Fed.R.Civ.P. 9015 (b), to have the jury trial conducted by the Bankruptcy Court.

46.    Venue is proper in this district pursuant to 28 U.S.C. §1409(a).

## II.

## RELEVANT FACTS

47.    As members of the board of directors of Superior Linen, Defendants Soto, Keister, Runzheimer, Goyette and Weiner owed a fiduciary duty to Superior Linen.

48.    As officers, Defendants Weiner and Gasser owed a fiduciary duty to Superior Linen.

49.    Collectively Defendants Goyette, Keister, Runzheimer and Soto exercised ultimate control over Superior Linen, by virtue of an arrangement by which they were designated as "required directors", and the approval of 3 of 4 of the required directors was required for corporate action.

50. Plaintiff is informed and believes, and thereon alleges, that in addition to its board members, Superior Linen's officers and manages included Defendants

51. Superior Linen was organized in 2010.

52. At the time of its organization, Superior Linen's sole manager was Goyette, and its President and CEO was Wiener.

53. Wiener was experienced in the commercial laundry business and possessed numerous hotel/casino contacts.

54. Wiener was to develop commercial accounts and run the operation, while Goyette was to contribute the cash necessary to fund operations.

55. In March of 2012 Superior Linen established a borrowing relationship with FCC, LLC d/b/a/ First Capital (the "FCC Loan"), which was originally not to exceed total borrowings of $5,000,000.

56. In December of 2014 Superior Linen borrowed an additional $6,750,000 from Midwest Community Development Fund VII, LLC.

57. As of February 11, 2015 Superior Linen's officers were Mr. Wiener, President and CEO, and Andrew Gasser ("Gasser"), Executive Vice President and Chief Financial Officer.

58. Both Wiener and Gasser were also minority owners of Superior Linen.

59. In February of 2014, Keister agreed to invest approximately $2,000,000 in Superior Linen, and became the Chairman of the Board.

60. Keister installed Gasser as an officer and CFO of Superior Linen.

61. Superior Linen has consistently suffered annual losses and cash flow difficulties since its inception.

62.     Prior to Keister's involvement, Superior Linen's CFO would make funding requests to Goyette, including the amount requested as well as a statement of what obligations would be paid from the requested funding.

63.     After February of 2014 such requests would be made to Keister, who served and continues to serve as Chairman of the Board of Superior Linen.

64.     In December of 2014 Runzheimer became an investor in Superior Linen in exchange for a $2 million cash infusion.

65.     On or about May 22, 2015, ACF FinCo 1 LP ("Ares") acquired the loan portfolio of FCC, LLC, including the FCC Loan.

66.     While Superior Linen had a good working relationship with FCC, LLC, it became apparent that Ares would seek to terminate the long standing lending relationship with Superior Linen.

67.     Runzheimer, Keister, Hermann, Goyette, Nanz and Kratzer, (the "Conflicted Directors") individually and/or via entities which they own and /or control, are owners of Superior Linen as well as being owners of RD VII.

68.     At the time Ares acquired the FCC Loan, the Conflicted Directors has pledged their ownership interests in Superior Linen as collateral for the FCC Loan.

69.     On or about August 1, 2015, Runzheimer and Hermann entered into a letter of understanding which reflected their plan to invest a total of $4,320,475, to be characterized as a loan to Superior Linen, and which was to be held for 120 days and repaid $4,689,415 + 10% interest.

70.     In order to achieve their goal of a short term profit, Runzheimer and Herman caused the corporate formation of an entity named RD VII.

71.     Upon information and belief, the "RD" in "RD VII" stands for Rex and Daryl.

72.    Runzheimer and the other Conflicted Directors purchased the FCC Loan from Ares (the "Loan Purchase").

73.    At the time of the Loan Purchase, Superior Linen owned machinery and equipment, inventory and accounts receivable with a value sufficient to pay off the FCC Loan.

74.    The Loan Purchase included the following elements:

a.    While Ares discounted the purchase price (to $3,303,210.52), the amount of the discount was credited as "funding" by Runzheimer and Daryl Hermann ("Hermann"), increasing their membership interest in RD VII.

b.    Superior Linen negotiated the terms of the Loan Sale.

c.    Superior Linen kept the accounts of RD VII.

d.    Superior Linen's counsel drafted the RD VII Operating Agreement.

e.    Superior Linen was required to increase the stated obligation under the FCC Loan by $750,000 earmarked for Keister and characterized as retroactive "management compensation"-a year after the RD VII Loan Purchase.

f.    Superior Linen was required to add a $200,000 "fee" in favor of RD VII.

g.    The interest rate on the FCC Loan was increased from 7.13-8.13% (LIBOR plus 6.5% on the revolving loan portion and LIBOR plus 7.5% on the term loan) to 10%.

h.    Superior Linen was required to issue additional equity interests to RD VII, but was paid nothing in exchange.

75.    Plaintiff is informed and believes, and thereon alleges, that RD VII was nothing more than the alter ego of Runzheimer, Hermann, and other individuals, the majority of whom owed fiduciary obligations to Superior Linen.

76.    RD VII did not have a bank account, did not keep books and records, and did not even execute an operating agreement until August of 2016, at which time Superior Linen was facing bankruptcy.

77.    Knowing that their actions violated their fiduciary duties, Runzheimer, Keister and others purportedly acting on behalf of Superior Linen created a "Consent" reciting that RD VII would "have no duty, fiduciary or otherwise, to consider its status as affiliates or members or the interests of the Company that it would otherwise be obligated to consider".

78.    RD VII's attorney characterized the resolution as giving "good cover" with regard to the fiduciary duties owed to the Company in an August 11, 2016 email to the Conflicted Directors and the Company.

79.    From and after August of 2015, it was the primary mission of Runzheimer, Keister and, via their control, Superior Linen to obtain a payoff of the inflated "obligation" to RD VII.

80.    RD VII insisted that it receive an immediate $5 million payment on the RD VII Loan, plus retain purported additional debt in the millions of dollars.

81.    While Superior Linen was able to secure refinancing which would have paid RD VII $4 million, with RD VII to "retain" millions in additional stated "debt" purportedly owing by Superior Linen, the Conflicted Directors caused Superior Linen to decline such refinancing in the second quarter of 2016.

82.    As stated by Keister in his email to Runzheimer, Goyette and Soto (copied to upper management of Superior Linen) of August 3M 2016 (referring to an upcoming board meeting), a "primary topic of course will be refinancing the company and getting the majority of the RDVII debt paid off and when we will be able to pay off all of RDVII."

83.    As stated by Superior Linen's CEO on April 22, 2016, the Company was "ordered" to "extend creditors and use vendors' money."

84.    On that same day, Keister authorized a $25,000 payment to purchase linen for a particular account, but berated the CEO and CFO for not obtaining the linen from a major vendor, Baltic Linen, earlier "when we were on open account".

85.    By late 2015, the Debtor's business model was failing. It was hamstrung with aging or already stale merchandise, it had underperforming contracts, cost overages and was in arrears on payments to its vendors (including Baltic Linen) and other creditors, it was in default on its loan to RDVII, or its predecessors in the loan (the "Lenders"), and the Officers, and Directors of Superior Linen (the "Insiders") were uncertain whether the Debtor could secure additional financing or a capital infusion that it required to continue operating. Thus, the Debtor was then insolvent by any measure. Moreover, and because of the nature of the Debtor's required reporting to the Lenders and the intimate relationship of the Lenders to the Insiders, and the Lenders' intimate knowledge of the Debtor's financial condition, the Lenders knew or should have known that the Debtor was insolvent by no later than late January or early February 2016, and that the Debtor's liquidation or initiation of bankruptcy proceedings was not only inevitable but necessary in the near term.

86.    Although the Insiders were fully aware of the Debtor's dire financial condition, they nevertheless worked hand-in-glove with the Lenders to fraudulently and/or negligently induce Baltic Linen and other vendors to manufacture and/or ship new inventory or equipment to the Debtor beginning in February 2016. Baltic Linen did ship in reasonable reliance upon the Insiders' material misrepresentations to Baltic Linen and omissions of material facts regarding the Debtor's financial condition.

87.    For their part, the Lenders, through their actions and the intimate relationship of the Lenders to the Insiders, were well aware of the Debtor's precarious financial condition but nevertheless approved, and even mandated, certain actions by the Insiders that the Lenders knew or should have known were designed to, and in fact did, induce Baltic Linen (and others) to ramp-up inventory production and deliveries to the Debtor. This ramp-up assured that there would be sufficient "in-transit" fresh merchandise and equipment sent to the Debtor, which would be the Lenders' collateral, to ensure that the Lenders were fully secured in the event of liquidation or at the time that the Debtor would eventually seek bankruptcy protection, just a few months later. The Lenders were fully aware that any new inventory acquired by the Debtor between February and the Petition Date was critical to improving the Lenders' financial position in the inevitable event of the Debtor's liquidation or insolvency proceeding or, at a minimum, maintaining the Debtor's financial status quo in terms of the Lenders' collateral position. Moreover, the Lenders' own internal analysis recognized that without continued deliveries from the vendors and, specifically, Baltic Linen, their ability to recover would be negatively impacted in a liquidation or when the Debtor filed for bankruptcy.

88.    The Insiders' "pump and dump" scheme—to pump-up the inventory, beyond the Debtor's needs, in the final days before dumping the entity into bankruptcy—was simple. First, beginning in February 2016, the Insiders targeted and promised key vendors full payment on outstanding obligations if new inventory at certain levels was shipped. The promise by the Insiders was fully supported, approved, and in fact mandated by the Lenders given the intimate relationship of the Lenders to the Insiders. The inducement to ship during this period was critical; after all, the Lenders' and Insiders knew that the security of the Lenders' investment was predicated on continued shipments of new merchandise by

Baltic Linen and other vendors. Absent this "in-transit" merchandise, the Lenders' recovery at the time of the inevitable liquidation or bankruptcy filing could be impaired.

89.    In other words, the evaluation of the Lenders' prospects for recovery on their investment took into account not only stale inventory and equipment that had little value, but the far more valuable fresh "in-transit" inventory and equipment that would have ceased if the vendors were made aware of Debtor's true financial condition. At no time, while inducing Baltic Linen and others to manufacture and/or ship millions of dollars of new inventory and equipment to the Debtor, did the Insiders ever provide the vendors an honest or accurate assessment of the Debtor's financial condition—and further, the Insiders actively solicited the Lenders to forebear, materially alter key documents, agreements, and/or covenants, and to remain silent during the relevant period of time. In point of fact, the Insiders and the Lenders knew and/or believed that the offered inducements to Baltic Linen and other vendors were worthless. However, certain Insiders misrepresented the true financial condition of the Debtor, and all of the Insiders withheld critical information regarding the Debtor, that served to mislead Baltic Linen as to the value of and the ongoing viability of the Debtor.

90.    Less than two months previously, Keister had met with Baltic Linen and convinced that company to extend further credit based on the agreement by Keister for Superior Linen to retire the debt to Baltic Linen within three months.

91.    In 2016 Superior Linen began negotiating with the Cosmopolitan Hotel to obtain its linen services contract (the "Cosmo Contract").

92.    Believing that securing the Cosmo Contract would positively impact their efforts to obtain a payoff of the inflated RD VII Loan, the Conflicted Directors pushed Superior Linen to secure the Cosmo Contract, including by directing that additional funds

needed for Superior Linen's operations be withheld until the Cosmo Contract was signed and delivered.

93.    Having instituted themselves as "secured lenders", the Conflicted Directors began to pursue the possibility of causing Superior Linen to file bankruptcy in order to effectuate a sale of the assets of Superior Linen, designed solely to benefit the Conflicted Directors at the expense of all others, including the other creditors and potentially the other shareholders of Superior Linen.

94.    In August of 2016, at the same time that the common principals and managers of Superior Linen and RD VII were attempting to create backdated documents with respect to the Loan Purchase, creditors were being assured that funding had been negotiated, as a basis to both delay collection efforts and to obtain additional credit advances from its vendors.

95.    On August 1, 2016, Weiner, Keister and Runzheimer were discussing using "creative dating of checks" to avoid paying creditors until the closing on the Cosmopolitan Contract.  Two days later, Superior Linen stopped payment on an $89,000 check to Baltic Linen, promising to make it good when the Cosmopolitan contract was signed.

96.    On August 4, 2016, Keister represented to Baltic Linen, the Company's largest vendor creditor, that Superior Linen had "additional committed lending based on the Cosmo contract being signed….As soon as the contract is signed we will have the funds to cover the check."

97.    The Insiders advised Baltic Linen that they were working with the Lenders and/or other lenders to secure new financing and, in fact, had secured such financing. The Insiders knew that their representations regarding new financing were false. Not only had the Debtor not secured any such financing, but the Insiders recognized that any new financing source would require the Debtor to reorganize through a bankruptcy or

other liquidation proceeding. Indeed, the so-called twelfth-hour "white knight," could only conceivably acquire substantially all of the Debtor's assets as a going concern, only through a sale process to be conducted pursuant to section 363 of the Bankruptcy Code after the Debtor filed bankruptcy. The contemplated bankruptcy filing and sale of the company's assets free and clear of all claims and interests, necessarily would have jeopardized Baltic Linen's and others ability to recoup payments for the new inventory and equipment shipped, and militated against the Debtor's ability to pay unsecured claims.

98.    In other words, while vendors were being enticed to manufacture and ship new and increasing amounts of merchandise based upon representations that the Insiders were solidifying the Debtor's financial footing with the active assistance of the Lenders and the intimate relationship of the Lenders to the Insiders, in fact the Insiders, working in concert with the Lenders, were actively preparing the Debtor for bankruptcy and were inducing vendors to ship so as to, in large measure, protect the Lenders' position in the soon-to-be-filed bankruptcy as the Lenders who were in part the Insiders and in control of the Debtor. Had the Insiders earnestly sought to avoid the Debtor's bankruptcy, based on their own analysis and the Debtor's then-current financial position, the Insiders would not have allowed the Debtor to accumulate excess inventory beyond the Debtor's needs, which the Debtor did despite its liquidity limitations. In fact, the Lenders mandated earnest bankruptcy preparations as a condition to any forbearance irrespective of and concurrently with the Debtor's efforts to acquire new inventory from vendors.

99.    Reasonably relying on the representations made to them (and the omission of material facts relating to the Insiders' wrongful scheme) during the period prior to the

Debtor's bankruptcy filing, vendors continued to ship fresh new inventory to the Debtor, and the Debtor secured inventory and equipment far in excess of what it could afford to pay.

100.    On August 10, 2016, the Conflicted Directors discussed instructing Superior Linen's CFO to refrain from admitting to the Company's insolvency.

101.    At the same time, Keister and the other Conflicted Directors were acting to "create more protection" for their fees "in the event of a bankruptcy" by Superior Linen.   See August 23, 2016, email from Keister to Runzheimer Hermann and others, including Superior Linen's bankruptcy counsel.

102.    In early 2016, the Lenders could simply have declared a material default, and directed/mandated/forced the Debtor to seek bankruptcy protection. But, based on the critical importance of new inventory and equipment, the Lenders knew that such a course of action may jeopardize the Lenders' security position in the event of a bankruptcy filing, such that the Lenders were exposed to the risk of not collecting fully on the outstanding loan amount, let alone reap the additional fees that they could recover solely as a result of this scheme.

103.    Accordingly, the Lenders were going to make sure that the Debtor's bankruptcy filing (which the Lenders internally recognized as imminent and unavoidable) benefited them, even if that meant that the Debtor would need to secure new inventory from the uninformed and unsuspecting Baltic Linen and others. The Debtor's acquisition of inventory from Baltic Linen during this time period served to convert the Lenders' potential losses into Baltic Linen' actual losses.

By early 2016, the Insiders and the Lenders given the intimate relationship of the Lenders to the Insiders knew or should have known that vendors (who already were not being paid timely) would neither manufacture nor ship new merchandise and equipment absent payment assurances, nor would the vendors do so if they knew the Debtor's true

financial condition. The Insiders and the Lenders given the intimate relationship of the Lenders to the Insiders knew or should have known that the inducements promised to Baltic Linen were all but worthless for at least the following reasons: (i) the tenuous nature of the collateral position and importance of the vendors continuing to ship new inventory, and the Insiders knew any promises of payment would have no value unless and until the value of Debtor's inventory exceeded its obligations to the Lenders; (ii) the Debtor was securing inventory beyond its needs and ability to pay at a time when it was subject to financial restrictions; (iii) the Lenders anticipated that the Debtor would file, or it would force the Debtor to file, for bankruptcy protection within a few months; and, (iv) the Lenders knew or should have known that the Insiders did not plan to pay the vendors as promised.

104.    Baltic Linen reasonably relied on the false representations of the Insiders and the Lenders given the intimate relationship of the Lenders to the Insiders regarding the Debtor's financial position, the Debtor's ability to repay Baltic Linen, and the Debtor's ability to secure new financing, as well as their omissions of material facts, when they agreed to ramp-up production and provide the Debtor with a fresh infusion of merchandise before the Debtor' bankruptcy filing. The Insiders, through the alleged recapitalization and the support of the Lenders, made credible and convincing representations to Baltic Linen of the Debtor's solvency—at a time when each of the Insiders and the Lenders given the intimate relationship of the Lenders to the Insiders knew otherwise. The Insiders' scheme could not have been accomplished without the material assistance of the Lenders in (i) concealing the forbearance from vendors, (ii) agreeing to withhold material information, (iii) agreeing to defer action on the Debtor's numerous defaults.

105.    Had Baltic Linen been advised of the Debtor's true financial condition and plans during early 2016 including the fact that the Insiders and the Lenders themselves believed that the promised payments were in fact worthless, the Debtor was insolvent, and the Debtor was then in breach of the Senior Loan Documents, and that the Debtor would face an inevitable bankruptcy within months, Baltic Linen would neither have ramped up production nor would it have shipped to the Debtor a single piece of new merchandise. Rather, the Debtor would have been forced to liquidate or seek bankruptcy protection at that time, and the Lenders would have suffered collateral exposure, and they likely would have lost any prospect of recovering certain fees and payments. Instead, through the Insiders' scheme embraced, authorized and adopted (and in part, mandated) by the Lenders given the intimate relationship of the Lenders to the Insiders, the negative financial ramifications were placed on the backs of the duped Baltic Linen and the Debtor's other creditors. Meanwhile, the Lenders received the benefit of the new inventory and equipment, which shored up the complete protection of their collateral position (to fund all interest, fees, costs, charges, and other amounts anticipated from the Debtor's planned bankruptcy).

106.    Based upon the nature of their agreements with the Debtor, the Lenders had the contractual right and/or sufficient leverage to force the Debtor into a liquidation or insolvency proceeding as early as February 2016. The Insiders and the Lenders knew or should have known that the Debtor was unlikely to secure further commitments from its vendors, such as Baltic Linen, to ship new inventory absent assurances that full payment would be timely made to the vendors, that Debtor's financial house was in order, and that the Lenders fully supported the Debtor's ongoing business plan/strategy.

107. As the bankruptcy filing approached, RD VII determined to become a "Debtor-in-Possession" or "DIP" Lender, seeking to require the Company to borrow additional funds under terms which included full releases of RD VII, its members, and affiliated parties; waiver of all claims and defenses to the RD VII Loan; an attempt to grant DIP loan protections to the prepetition loan; and increasing the interest rate and the default rate (under terms virtually guaranteed to bring about a default).

108. Not only did RD VII require that the Company file for bankruptcy protection in order to obtain additional funds (which were part of the loan package and forbearance agreed to in documents signed in August of 2016); but RD VII via its control of the Debtor prohibited the Debtor for accepting, or even negotiating, with another lender who offered better terms for the DIP loan.

109. Although the bankruptcy filing was based on an authorization purporting to be a "Unanimous" consent of members, in fact not all of the members consented, or were even consulted, with respect to the bankruptcy filing.

110. In undertaking the actions described above, the Conflicted Directors breached their fiduciary duties to Superior Linen.

111. While serving as President of Superior Linen, Weiner violated his fiduciary duties to Superior Linen by owning a large interest in a competing laundry service, New Image, as well as by taking excessive compensation and by paying his personal expenses with Company funds.

112. New Image operated out of the former facilities of Superior Linen, subleasing their space directly from Superior Linen's master lease of that property.

113.    Though Weiner claimed that New Image was a dry cleaning service and thus did not compete with Superior Linen, in fact New Image conducted the same line of business as Superior Linen.

114.    Plaintiff is informed and believes, and thereon alleges, that Weiner did actually funnel clients of Superior Linen into New Image, specifically including a linen service contract with Howard Johnson.

115.    Weiner's activities also constituted a breach of his non-compete agreement with Superior Linen.

116.    Wiener has thus received compensation from Superior Linen to which he is not entitled.

117.    Weiner also took funds from the Company to support his extravagant personal lifestyle.

118.    Plaintiff is informed and believes, and thereon alleges, that Weiner took $7,000-$10,000 per month for various "entertainment" expenses which were unsubstantiated as company expenses.

119.    Weiner would instruct Superior Linen's CFO that large checks be written to Weiner when he travelled, and failed to substantiate the sums taken as business expenses.

120.    Plaintiff is informed and believes, and thereon alleges, that Superior Linen provided consideration for Mr. Weiner's residential expenses in renting a residence from Goyette.

121.    Plaintiff is informed and believes, and thereon alleges, that  Weiner took excessive salaries.

122.    Plaintiff is informed and believes, and thereon alleges, that, while Weiner reported his salary (in his personal bankruptcy) as $125,000 per year, he Weiner actually took a salary of double that amount, and in addition may have charged substantial "commissions."

123.    Following the filing of the Bankruptcy, Debtor made numerous payments to BrightLight, purportedly based on "management services" provided by Keister (the "BrightLight Post-Petition Transfers").

124.    The BrightLight Post-Petition transfers were not authorized by the Bankruptcy Court.

125.    Plaintiff is informed and believes, and thereon alleges, that the BrightLight Post-Petition transfers were made for the benefit of Keister and/or actually received by Keister.

126.    By order entered by the Bankruptcy Court on December 16, 2016 [DE 152], Plaintiff was granted "leave, standing, and authority to commence, prosecute, and settle causes of action which would otherwise be brought by the Debtor or the Debtor's Estate including, but not limited to, claims described in the "Release of Claims" provision of the Stipulation By And Between The Debtor And RD VII Investments, LLC For Consent To Use Cash Collateral Pursuant To 11 U.S.C. § 363(c)(2), And Granting Adequate Protection Pursuant To 11 U.S.C. §§ 362 And 363(e); causes of action pursuant to 11 U.S.C. §§ 457 and 550; and any shareholder derivative actions or comparable claims."

## FIRST CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTIES

**Against the Officers and Directors of Superior Linen (Believed to be Defendants**

**Soto, Keister, Runzheimer, Goyette, Weiner, and Gasser)**

127.    Plaintiff repeats and realleges each of the allegations set forth above.

128.    As recognized by the Nevada Supreme Court: "'[T]he duty of loyalty requires the board and its directors to maintain, in good faith, the corporation's and its shareholders' best interests over anyone else's interests."

129.    In committing the acts herein alleged, the officers and directors of Superior Linen breached their fiduciary duties to Superior Linen.

130.    Such breaches of fiduciary duty included, without limitation, putting their own interests above the interests of the company, usurping corporate opportunities for their own benefit, and operating Superior Linen in such a manner that it needlessly obtained numerous extensions of credit, including vendor credit, which it had no ability to repay, in the hopes that such continued operation would inure to the personal benefit of the Defendants.

131.    As a result of the Plaintiffs breach of fiduciary duties, Superior Linen and its creditors were damaged, in an amount which will be proven at trial.

## SECOND CAUSE OF ACTION

## EQUITABLE SUBORDINATION

### (11 U.S.C. §510)

#### (Against All Defendants)

132.    Plaintiff repeats and realleges each of the allegations set forth above.

133.    In committing the acts herein alleged, Defendants engaged in inequitable conduct.

134.    Defendants' misconduct resulted in injury to the creditors of Superior Linen.

135.    Defendants' misconduct conferred an unfair advantage on the Defendants.

136.    Equitable subordination is not inconsistent with the provisions of the Bankruptcy Code.

/ / /

**THIRD CAUSE OF ACTION**

**RECOVERY OF PREFERENTIAL TRANSFERS**

137.    Plaintiff repeats and realleges each of the allegations set forth above.

138.    Plaintiff is informed and believes, and thereon alleges, that, in the one year prior to its bankruptcy filing, Superior Linen paid to BrightLight Holdings, LLC the sum of $19,049.97.

139.    Plaintiff is informed and believes, and thereon alleges, that the transfers discussed in the preceding paragraph was also made for the benefit of, and accrued to the benefit of, Defendant Richard Keister.

140.    Plaintiff is informed and believes, and thereon alleges, that, in the one year prior to its bankruptcy filing, Superior Linen paid to Defendant Wiener "reimbursements" in an amount not less than $71,968.72.

141.    Plaintiff is informed and believes, and thereon alleges, that additional transfers may have been made to the insiders and affiliates of Superior Linen within the one year prior to its bankruptcy filing.

142.    Plaintiff is informed and believes, and thereon alleges, that such transfers were made while the Debtor was insolvent.

143.    Plaintiff is informed and believes, and thereon alleges, that such transfers enabled the transferees to receive more than they would receive in a chapter 7 liquidation.

144.    Accordingly, such transfers are avoidable pursuant to 11 U.S.C. § 547.

145.    In addition, such transfers are voidable as against subsequent transferees pursuant to 11 U.S.C. § 550.

/ / /

/ / /

## FOURTH CAUSE OF ACTION

## RECOVERY OF FRAUDULENT TRANSFERS

## AGAINST DEFENDANT WIENER

146.    Plaintiff repeats and realleges each of the allegations set forth above.

147.    Plaintiff is informed and believes, and thereon alleges, that Wiener regularly obtained funds and property from Superior Linen, including in the form of cash, checks, "reimbursements", goods, and living quarters, for which no reasonably equivalent value was obtained by Superior Linen.

148.    Plaintiff is informed and believes, and thereon alleges, that Wiener obtained such property with the actual intent to defraud Superior Linen, its owners, and its creditors.

149.    Plaintiff is informed and believes, and thereon alleges, that such transfers were made without Superior Linen receiving reasonably equivalent value.

150.    Plaintiff is informed and believes, and thereon alleges, that such transfers were made while Superior Linen was insolvent.

151.    Plaintiff is informed and believes, and thereon alleges, that such transfers are avoidable pursuant to both Nevada law (including NRS Chapter 112) and pursuant to 11 U.S.C. § 548.

152.    Such transfers are also avoidable as against subsequent transferees pursuant to 11 U.S.C. § 550.

## FIFTH CAUSE OF ACTION

## SHAREHOLDER DERIVATIVE CLAIMS

**Against the Officers and Directors of Superior Linen (Believed to be Defendants Soto, Keister, Runzheimer, Goyette, Weiner, and Gasser)**

153.    Plaintiff repeats and realleges each of the allegations set forth above.

154.    In committing the breaches of fiduciary duty and other actions herein alleged, Defendants breached their duties to, inter alia, the shareholders of Superior Linen.

155.    Plaintiff has made demand on the Debtor for investigation and prosecution of the Shareholder Derivative Claims.

156.    Plaintiff is entitled to prosecute the Shareholder Derivative claims by virtue of the bankruptcy filing and the Standing Order.

**SIXTH CAUSE OF ACTION**

**AVOIDANCE OF UNAUTHORIZED POST-PETITION TRANSFERS**

**(AGAINST DEFENDANTS WIENER, BRIGHTLIGHT AND KEISTER)**

157.    Plaintiff repeats and realleges each of the allegations set forth above.

158.    Plaintiff is informed and believes, and thereon alleges, that Defendants Keister and Brightlight received post-petition transfers from Superior Linen, including, without limitation, the following transfers reflected in Superior Linen's Monthly Operating Report:

159.    Plaintiff is informed and believes, and thereon alleges, that Defendants Keister and BrightLight received post-petition transfers from Superior Linen, including, without limitation, transfers in excess of $34,000 paid to BrightLight for benefit of Keister.

160.    Plaintiff is informed and believes, and thereon alleges, that the payments described in the preceding paragraph were made for professional services rendered by Defendant Keister, and were for his benefit.

161.    Neither approval of employment nor approval of payment of Defendant Keister or Defendant Brightlight were obtained from the Bankruptcy Court.

162.    Plaintiff is informed and believes, and thereon alleges, that Defendant Wiener received post-petition transfers from Superior Linen, including commissions, and purported "expense reimbursements".

163.   Plaintiff is informed and believes, and thereon alleges, that none of the transfers described in this cause of action was authorized by the Bankruptcy Court.

## SEVENTH CAUSE OF ACTION

## BREACH OF CONTRACT

### (Against Defendant Weiner)

164.   Plaintiff repeats and realleges each of the allegations set forth above.

165.   At the times mentioned herein, Defendant Weiner and Superior Linen were parties to a written contract, which included a prohibition against Defendant Weiner from competing with Superior Linen.

166.   Plaintiff is informed and believes, and thereon alleges, that Weiner breached the terms of his employment contract by owning and/or operating and/or providing confidential information of Superior Linen to a competing business, New Image, and funneling business from Superior Linen to New Image.

167.   Plaintiff is informed and believes, and thereon alleges, that Weiner breached the terms of his employment contract by owning and/or operating and/or providing confidential information of Superior Linen to a competing business, Max Enterprises, LLC, and by funneling business from Superior Linen to Max Enterprises, LLC.

## EIGHTH CAUSE OF ACTION

## RECHARACTERIZATION OF DEBT

### (Against Defendant RD VII)

168.   Plaintiff repeats and realleges each of the allegations set forth above.

169.   All claims of RDVII based on purported "loans" to Superior Linen should be recharacterized as equity contributions.

170.    This Court is empowered to order recharacterization as a matter of equity under 11 U.S.C. § 105.

171.    Plaintiff is informed and believes that RDVII, its Owners, Officers, and Directors and/or their affiliates made alleged loans to Superior Linen aggregating approximately $10,535,935 (including purported interest and fees) as of the Petition Date, with another approximately $2,100,000.00 principal post-petition.

172.    Evidence that the loans constitute equity contributions and not debt includes, but is not limited to, the following:

a.    Superior Linen was reliant on funding from RDVII, and RDVII consistently underfunded the needs of Superior Linen, leading to annual shortfalls, routine failures of equipment, undercapitalization, and the failure of Superior Linen to be able to consistently meet the payment demands of its vendors and employees.

b.    The loans were made by RDVII, which share insiders with Superior Linen.

c.    There is evidence that other sources of outside funding were available on more favorable terms, but that Superior Linen rejected said financing in order to benefit RDVII at the expense of Superior Linen.

d.    There was no sinking fund for repayment of the loan.

e.    While Ares discounted the purchase price (to $3,303,210.52), the amount of the discount was credited as "funding" by Runzheimer and Daryl Hermann ("Hermann"), increasing their membership interest in RD VII.

f.    Superior Linen negotiated the terms of the Loan Sale.

g.    Superior Linen kept the accounts of RD VII.

h.    Superior Linen's counsel drafted the RD VII Operating Agreement.

i.      Superior Linen was required to increase the stated obligation under the FCC Loan by $750,000 earmarked for Keister and characterized as retroactive "management compensation"-a year after the RD VII Loan Purchase.

j.      Superior Linen was required to add a $200,000 "fee" in favor of RD VII.

k.      The interest rate on the FCC Loan was increased from 7.13-8.13% (LIBOR plus 6.5% on the revolving loan portion and LIBOR plus 7.5% on the term loan) to 10%.

l.      Superior Linen was required to issue additional equity interests to RD VII, but was paid nothing in exchange.

## NINTH CAUSE OF ACTION

### EQUITABLE DISALLOWANCE PURSUANT TO 11 U.S.C. §510(C)

### (Against RDVII)

173.    Plaintiff repeats and realleges each of the allegations set forth above.

174.    In the alternative, RDVII's claims should be equitably disallowed.

175.    This Court is empowered to order the equitable disallowance of RDVII's claims under 11 U.S.C. § 510(c).

176.    Equitable disallowance is warranted based on the following facts, evidencing the inequitable conduct of the Officers and Directors of Superior Linen, and RDVII and its Owners, Officers, and Directors.

a.      RDVII and Superior Linen share Insiders.

b.      The Insiders of  RDVII exercise considerable control over the actions of Superior Linen.

c.      As described above, Superior Linen acted against its interests, and the interests of its shareholders and other creditors, solely for the benefit of RDVII and RDVII's Owners, Officers, and Directors.

d.      Such actions were taken even though they caused breaches of Superior Linen's fiduciary duties.

e.      Superior Linen negotiated the terms of the Loan Sale.

f.      Superior Linen kept the accounts of RD VII.

g.      Superior Linen's counsel drafted the RD VII Operating Agreement.

h.      Superior Linen was required to increase the stated obligation under the FCC Loan by $750,000 earmarked for Keister and characterized as retroactive "management compensation"-a year after the RD VII Loan Purchase.

i.      Superior Linen was required to add a $200,000 "fee" in favor of RD VII.

j.      The interest rate on the FCC Loan was increased from 7.13-8.13% (LIBOR plus 6.5% on the revolving loan portion and LIBOR plus 7.5% on the term loan) to 10%.

k.      Superior Linen was required to issue additional equity interests to RD VII, but was paid nothing in exchange.

### TENTH CAUSE OF ACTION

### SURCHARGE PURSUANT TO 11 U.S.C. § 506(C)

### (Against RDVII)

177.    Plaintiff repeats and realleges each of the allegations set forth above.

178.    From the inception, Superior Linen's bankruptcy was calculated to benefit a single party, RDVII.

179.    Due to the nature of RDVII's "loans" to Superior Linen, RDVII has derived the vast majority of the purchase of Superior Linen's assets pursuant to the sale of those assets in this bankruptcy.

180.    As described above, the Owners, Officers, and Directors of RDVII exercised control over Superior Linen, including the timing and strategy of Superior Linen's bankruptcy filing.

181.    If this Court does order recharacterzation, equitable disallowance, and/or equitable subordination of RDVII's claims, as the bankruptcy was calculated, and did, benefit RDVII to the exclusion of Debtor's other creditors, all professional fees incurred in Debtor's bankruptcy should be surcharged, pursuant to 11 U.S.C. § 506(c) against the claims of RDVII, from the date of the Petition until the date that the Chapter 11 case is closed.

182.    The Professional fees incurred are reasonable, necessary, and were beneficial to RDVII's recovery of any amounts on RDVII's claims.

183.    The Professionals performed the Services based on representations that the claims would be paid.

184.    If the Professionals had not performed the Services, the Debtor's Chapter 11 case could not have proceeded and RDVII would not have realized a recovery on its claims.

185.    Based upon the facts and circumstances described above, this Court should surcharge RDVII's claims for the Professional Fees under 11 U.S.C. § 506(c).

**ELEVENTH CAUSE OF ACTION**

**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

**(Against All Defendants)**

186.    Plaintiff repeats and realleges each of the allegations set forth above.

187.    Each of the Officers and Directors of the Debtor had a fiduciary relationship with the Debtor.

188.    The Officers and Directors of the Debtor breached this fiduciary relationship through the actions described above.

189.    All other Defendants knew of the fiduciary relationship between Officers and Directors and the Debtor, and knowingly participated in the breach of that fiduciary Duty.

190.    As a result of the breach of the fiduciary duty, Superior Linen and its creditors were damaged in an amount to be proved at trial.

## TWELFTH CAUSE OF ACTION

## ALTER EGO

### (Against Runzheimer, Hermann, RDVII, other defendants)

191.    Plaintiff repeats and realleges each of the allegations set forth above.

192.    At all times described above, RDVII acted as the Alter Ego of Runzheimer, Hermann, and other Defendants.

193.    At all times described above, Runzheimer, Hermann, and other Defendants exercised influence and government of RDVII.

194.    A unity of interest and ownership existed between RDVII, Runzheimer, Hermann, and other defendants such that RDVII and the individual Defendants were inseparable from another.

195.    As described above, facts exist which would promote injustice if the adherence to the corporate fiction of a separate identity were upheld.

196.    Among other factors described above, the Alter Ego is shown by RDVII's comingling of funds, failure to observe corporate formalities, and loans from the corporation to benefit the individuals' personal interests.

197.    Thus, recognizing a separate corporate existence would bring about an inequitable result.

/ / /

/ / /

## THIRTEENTH CAUSE OF ACTION

## FRAUDULENT INDUCEMENT/MISREPRESENTATION/CONCEALMENT

### (Against Debtor's Officers and Directors)

198.    Plaintiff repeats and realleges each of the allegations set forth above.

199.    Superior Linen, through its agents, Officers, and/or Directors routinely deceived vendors, such as Baltic Linen, to extend credit to Superior Linen under false pretenses.

200.    Such false pretenses include the concealment of Debtor's true financial status, the misrepresentation of Debtor's financing options, and promises of payment on which Debtor would never be able to perform, and had no intention of performing.

201.    At all times, Superior Linen knew that such representations were false.

202.    Superior Linen made such representations with the intent that Debtors' creditors rely on them.

203.    Debtor's creditors did so rely.

204.    Debtor's creditors were injured as a result of their reliance on Superior Linen's false representations, inducements, and concealments.

## FOURTEENTH CAUSE OF ACTION

## CIVIL CONSPIRACY

### (Against All Defendants)

205.    Plaintiff repeats and realleges each of the allegations set forth above.

206.    As described above, Superior Linen acted in concert with its Officers and Directors, and with RDVII, and RDVII's Owners, Officers, and Directors to fraudulently conceal, misrepresent, and induce Debtor's creditors to extend favorable terms to Superior Linen.

207.    In addition, as described above, Superior Linen, its Officers and Directors, RDVII, and RDVII's Owners, Officers, and Directors acted in concert to put their own interests above the interests of the company, and usurping corporate opportunities for their own benefit.

## FIFTHTEENTH CAUSE OF ACTION

## CIVIL CONSPIRACY TO DEFRAUD

### (Against All Defendants)

208.    Plaintiff repeats and realleges each of the allegations set forth above.

209.    As described above, Superior Linen, its Officers and Directors, RDVII, and its Owners, Officers, and Directors acted in concert to harm the Creditors and shareholders of Superior Linen, by inflating the value of Superior Linen.

210.    As described above, Superior Linen, its Officers and Directors, RDVII, and its Owners, Officers, and Directors engaged in acts of fraud against the creditors and shareholders of Superior Linen, including but not limited to, fraudulent inducement/concealment/representation, in that those parties concealed Debtor's true financial status, misrepresented Debtor's financing options, and promised payment on which Debtor would never be able to perform.

211.    Due to the above actions of Superior Linen, its Officers and Directors, RDVII, and its Owners, Officers, and Directors, Superior Linen's Shareholders and Creditors were injured.

## SIXTEENTH CAUSE OF ACTION

## CONVERSION THROUGH EMBEZZLEMENT

### (Against Weiner)

212.    Plaintiff repeats and realleges each of the allegations set forth above.

213. Weiner converted property of Superior Linen in that Weiner filed claims which supported his lavish lifestyle in the guise of "reimbursements" for unnecessary expenses, including, upon information and belief, that Weiner took $7,000-$10,000 per month for various "entertainment" expenses which were unsubstantiated as company expenses, that Weiner would instruct Superior Linen's CFO that large checks be written to Weiner when he travelled, and failed to substantiate the sums taken as business expenses, that Superior Linen provided consideration for Mr. Weiner's residential expenses in renting a residence from Goyette, that Weiner took excessive salaries, and that, while Weiner reported his salary (in his personal bankruptcy) as $125,000 per year, he actually took a salary of double that amount, and in addition may have charged substantial "commissions."

214. Such conversion caused property which was owned by Superior Linen to be transferred to Weiner under false pretenses.

215. Such transfer caused harm to the shareholders of Superior Linen.

## SEVENTEENTH CAUSE OF ACTION

## FRAUDULENT

## INDUCEMENT/MISREPRESENTATION/CONCEALMENT/NEGLIGENT

## MISREPRESENTATION

## (Against All Defendants)

216. Plaintiff repeats and realleges each of the allegations set forth above.

217. Superior Linen, through its agents, Officers, and/or Directors routinely induced vendors, such as Baltic Linen, to extend credit to Superior Linen by virtue of misrepresentations.

218.    Such misrepresentation include the concealment of Debtor's true financial status, the misrepresentation of Debtor's financing options, and promises of payment on which Debtor would never be able to perform, and had no intention of performing.

219.    At all times, such individuals knew or should have known that such representations were false.

220.    The representations were made with the intent that Debtors' creditors rely on them.

221.    Debtor's creditors did so rely.

222.    Debtor's creditors were injured as a result of their reliance on the false representations, inducements, and concealments.

PRAYER FOR RELIEF

Based on the foregoing, Plaintiff prays for relief against Defendants as follows:

1.    For recovery of damages, in an amount proven at trial.

2.    For recovery of avoidable transfers.

3.    For costs of suit.

4.    For attorneys' fees and costs as permitted by law.

5.    For punitive or exemplary damages.

DATED this 17TH day of July, 2017.

MORRIS POLICH & PURDY, LLP

CANDACE C. CARLYON, ESQ.
Nevada Bar No. 2666
MATTHEW R. CARLYON, ESQ.
Nevada Bar No. 12712
3800 Howard Hughes Parkway, Suite 500]
Las Vegas, NV 89169
*Counsel for Unsecured Creditors Committee*

35